Mr. Fisher, good morning. Good morning, Your Honor. Good morning to all of you, may it please the court, counsel, I'm representing the defendant in this case, John West. Mr. West was convicted in a stipulated bench trial of cannabis trafficking. Specifically, the judge found on March 14, 2013, the defendant knowingly brought more than 5,000 grams of a substance containing cannabis into Illinois with the intent to sell it either in Illinois or in another state. Mr. West was sentenced to the minimum term of 12 years imprisonment. Three issues are raised on appeal. The first issue, the defendant maintains that the search of his vehicle was unlawful. Because although he was subjected to a lawful traffic stop, a valid traffic stop, that stop was unduly prolonged by the police officer, even though the officer did not have reasonable suspicion to believe that Mr. West was engaged in criminal activity. Furthermore, although the trial judge found that the defendant consented to the search of the vehicle, that consent was not voluntary, but rather was mere acquiescence to the officer's authority. Mr. West therefore asked this court in issue one to reverse the order denying the motion to suppress and to reverse his conviction outright. Because without the cannabis, the state would not have sufficient evidence to prosecute him. Alternatively, in issue two, he asked this court to reduce his street value fine. The fine here was based on all of the substance found in his vehicle, but only some of that substance was tested by the crime lab. The defendant submits that a street value fine must be based on proof of illegal drugs possessed by the defendant. Finally, issue three is a $5 a day funds and fees credit issue. The state concedes that issue, so that issue is uncontested. In argument today, I would like to focus on issue one, the search and seizure issue. If your honors have questions about issue two or even issue three, of course I'd be happy to address those as well. Now at the hearing on the motion to suppress, judge heard testimony from a single witness, Officer Johnson, who effectuated the stop in this case. In addition, the judge viewed the squad car videotape of the encounter between Officer Johnson and Mr. West, and of course that videotape is part of the record on appeal. The evidence clearly shows that this was a valid traffic stop, because the officer witnessed the defendant's vehicle exceeding the speed limit and witnessed the defendant not wearing a seat belt. So it was a valid stop, pulled the defendant over by the side of Interstate 80, the early evening hours of March 14, 2013. The defense admits, however, that the officer unduly prolonged that stop, even though he did not have suspicion to believe that the defendant was transporting drugs or engaged in any other illegal activity. Now, trial defense counsel, when we argued the motion in the court below, counted approximately 36 so-called drug interdiction questions, questions primarily asking about the defendant's travel plans, where he was coming from, where he was going to, how long it was going to take, who he was going to meet at his destination, how he was going to get in touch with those individuals, and when he was planning on returning. Now, perhaps some of these questions might have been reasonable, but the officer asked the same questions in essence over and over and over again, defending giving the same answers. Now, the officer maintained that he was suspicious, and he referred to various observations. The defendant would submit that those observations, even cumulatively, were completely innocuous. For example, the fact that the defendant's suitcase was in the passenger compartment of the vehicle and not in the vehicle trunk. The fact that what appeared to be an auto mechanic's shirt was hanging in the window of the car, as opposed to a fancier or more expensive piece of clothing. The fact that the defendant was traveling from Arizona to Michigan and then intended to return to Arizona by automobile and not by airplane. And also some general observations of nervousness, according to the officer. Even cumulatively, the defendant submits that these factors did not give rise to a reasonable suspicion to believe that this individual was engaged in criminal activity. Well, he doesn't need reasonable or articulable suspicion to ask for consent to search, does he? That's true. That's true, and that comes later. Defendant submits that the consent was not voluntary, and part of the analysis there is all of these questions that he was asked initially. Whose burden is it at a motion of surprise? Burden is on the defense. Did the defendant testify about how he felt? The defendant did not testify in this case. It was only the officer. So how is the judge supposed to figure that this guy felt coerced if he didn't get up and say that? Well, I mean, certainly there would have been relevant evidence. It might have been helpful evidence. The defendant relies here on the objective circumstances, and ultimately I think it's an objective test regardless. Because even if the defendant had gotten up and said, well, I felt coerced, I think the judge could have rejected it. In this case, I don't think he should have rejected it, but talking in general, defense relies here on the objective circumstances. Now, approximately 14 minutes after he was pulled over, after Mr. West was pulled over, the officer returned to him his driver's license, handed him a warning ticket, and told him he was free to leave. And he exited the officer's squad car. Even at that point, however, about 20 seconds after the defendant exited the squad car, the officer got out of his squad car and asked the defendant, can I talk to you further? And the defendant said, OK. The officer said, why don't we come over here to the side of the road, a little bit away from the defendant's vehicle. He then proceeded to ask the defendant about a camera that was positioned on the rear window ledge of the defendant's vehicle. Two interesting points to be made here. First of all, the officer was asked, and he testified at the suppression hearing, that he had no reason to believe there was anything unlawful about the camera or any reason to believe that the defendant unlawfully possessed the camera. So those questions basically had no particular purpose. But the defendant's not seized at that point, right? He's told the guy he's free to go. He's told he's free to go. He begins asking these questions about the camera. He then proceeds to ask the defendant once again about his travel plans, about where he's coming from, where he's going to, how long the trip is going to take, ground that had been covered several times when the two men were inside the officer's squad car. He then proceeds to ask the defendant twice, are you carrying anything illegal in your vehicle? And twice the defendant says no. The officer then asks four separate questions. Are you carrying cannabis in the vehicle? No. Are you carrying cocaine in the vehicle? No. Methamphetamine? No. Heroin? No. He then asks for consent to search. The defendant says, okay, go ahead. At that point, the officer says to him, you know, you seem kind of nervous. Why are you nervous? The defendant says something about being the subject of a traffic stop. At that point, and I think this is crucial, at that point, and you're obviously going to look at the tape and time it out, but approximately two and a half minutes after the defendant was told he was free to leave, approximately 16 and a half minutes after the defendant's car was pulled over, a second officer arrives on the scene. Now, Officer Johnson testified that approximately four minutes into the stop, he radioed police headquarters and requested a canine officer. He was told, however, there was no canine officer in the vicinity. So at that point, he asked for a backup officer. I would submit, Your Honors, that all of these repeated questions by Officer Johnson and then the questions about the camera outside the car and again asking about his travel plans were asked in part because of curiosity, but I think also in large part because there was delay until that second officer arrived on the scene because the search did not commence until after the second officer arrived. Not even once the second officer did arrive. And at this point, the defendant had given consent, but even at that point, the second officer arrives and Officer Johnson escorted the defendant back towards the second officer and had him recount in the second officer's presence once again his travel plans. And then at that point, Officer Johnson said to the defendant, Now, do I still have your, and again, this is in the backup officer's presence now, do I still have your consent to search the vehicle? And the defendant says yes. Approximately four minutes after he's told he's free to leave, approximately 18 minutes after the car was pulled over, the search of the car commences. Now, I would submit, Your Honors, even without Mr. West testifying, that looking at this evidence objectively, that practically any reasonable citizen in Mr. West's shoes, not having any legal background or training, would believe that although he had been told he was free to leave, he really wasn't. Because these same questions are continuing. And now I have a second officer. If I'm free to leave, why is the police force tying up valuable resources with a second officer on the scene? And now I have to explain myself to Officer No. 2. Now, certainly Your Honors know, and I know, and counsel for the state knows, that Mr. West could have insisted on his rights here. He could have simply said, look, you gave me the warning ticket, you told me I was free to leave, I'd like to be on my way, you know, good evening and goodbye. He could have done it. And in retrospect, in terms of his personal choice, he should have done it. But this man has no legal background, no legal training. That was not required to happen. I'm not saying, well, police can only search vehicles of lawyers or what have you. I'm not making that argument. But, again, it's a case-by-case analysis, the totality of the circumstances. Practically any reasonable citizen here would believe, you know, the message being communicated is, yeah, I told you I can leave, but I'm not done with you. You haven't yet satisfied me. So you better either give me different answers to these same questions and or you better allow me to search the car. And that's why the defendant argues that this was acquiescence. It was not voluntary, valid consent. Well, the counter-argument is the second question is, given this guy another opportunity to grow his consent. Say, now, by the way, do I still have your consent to search? And certainly, even having not been given that opportunity, you can certainly revoke before the search begins. I think it's more with a wink and a nudge. But, again, I think the message being communicated is, well, you know, if you say now you want to leave and now you're taking back your consent, that's just going to engender additional suspicion and we're going to prevent you from leaving. Officer Johnson didn't give that testimony. But I'm talking about what is communicated to the defendant. And certainly the words that are communicated are extremely important, but I think you have to, again, have to look at the totality of the circumstances and how would a reasonable citizen react under these circumstances. Again, the continuing questions over and over again, and then the same questions about travel plans, even once he gets out of the car. And when the second officer arrives, the same exact questions. He's answered them several times. The only message can be, you know, we're not satisfied and the only way you can satisfy us is let us look in your vehicle. And that's why the defendant submits that the judge erred in denying the motion to suppress because this was not a valid voluntary consent search. This was the officer. Is this a second seizure? Oh, I'm sorry. Is this a second seizure? Is that what you're arguing? I'm sorry, Your Honor. Is this a second seizure? In effect, in effect, yes. I mean, we would look at it as a long, long 18-minute stop with about a 20-second break in the middle. But, yes, based on the case law and the fact I'm getting out of the car, I was told very quickly, asked very quickly, can I talk to you further? And it's a second seizure now. It's certainly acknowledged that the, for example, the Mendenhall factors that are sometimes discussed in the case law don't seem to apply here. There's no evidence of a weapon being drawn. I mean, the officers are, I think the officer even acknowledges, sure, he's armed, but no weapons are drawn. You look at the tape, there doesn't seem to be any raising of a voice or change in tone of voice. There aren't really any threats communicated here. Although I do think the presence of the second officer is additionally intimidating. Of course, the case law says that the Mendenhall factors are not exclusive. And, again, you have to look at all of the circumstances. And even separate and apart from that, there's still a separate question. Since the state is alleging and the judge found a consent search, there's still a separate question. Is that consent, was that consent truly voluntary? Was it valid? If the defendant submits under the circumstances, it was not. The only other thing, really, I have some questions from your honors. With respect to the prolonging, the state had argued, well, the defendant's really relying on an invalidated or outdated theory here, which is where the officer's questions alter the purpose, the initial purpose of the stop. And the defendant certainly acknowledges that after Cabayas, Harris, and Cosby, that theory is no longer good law. That's not the theory the defendant's argued here. He's argued a theory that is still valid after those cases, and that's the prolonging of the stop. The state also argues that, well, since it was a traffic stop, the officer had to accomplish certain tasks arising from the violations. He had to run the defendant's driver's license. He had to write a warning ticket. And the defendant agrees with that. All this defendant had to do was do what Mr. Rodriguez did and said, hey, no thanks, I'd like to be on my way. And he could have, and I'm sure any of us would have done that. Maybe some other citizens would have done that. Under the circumstances, and I think the prolonging of the stop, even if your honors say, well, the important thing is consent, what happens during that first 14 minutes, again, I think is crucial as to whether this was voluntary consent. I think the clear message being sent here is you're not free to leave. And I think most citizens in Mr. West's shoes would feel I'm at the mercy of the police until they say, okay, get out of here. The U.S. Supreme Court says a reasonably innocent person. What a reasonably innocent person would feel like. I frankly think even a reasonably innocent person would be intimidated under the circumstances. Whether there's something in the car, whether there's not something in the car, I think a reasonably innocent individual without legal background, look, they're asking me these questions, there's another officer on the scene, I've not yet been released. And if I just say goodbye, they're probably going to say, no, no, no, wait a minute, you can't leave. Now, they couldn't unless they believed they had their probable cause, basically, but I think a reasonably innocent person in these circumstances would feel I'm not free. They're not done with me. And for those reasons, Mr. West respectfully asks Your Honors to reverse the order denying this appropriate motion and to reverse the conviction. Questions? Thank you, Mr. Court. Thank you, Your Honors. Mr. Arado, good morning. Thank you, Mr. Court. Good morning, Your Honors, counsel, Thomas Arado for the people. The response to most of this argument has to be really under the case law. The officer did exactly what he's either expected or required to do. When the stop was made, it was a valid stop. There's no contesting about that. He ran the defendant's license. Defendant brought up the fact that, well, hey, you know what, there's this other John West guy. Well, what's the cop supposed to do at that point? He's got to run the other John West information, make sure the descriptors don't match this John West. So that's going to add on to a little bit of the time. That's the defendant's responsibility. As far as the timing goes, Officer Johnson testified his average traffic stops were 14, 15 minutes. This fell well within that average time. There's no indication that while he was asking these questions that those questions were prolonging the stop. Officer Johnson testified that he was continuing to run through the computer program, make his calls in, do what the standard operating procedures are for a traffic stop during that time. So there was nothing to indicate that the prolonging of the stop was made in this case. After he tells him he's free to go, Oliver, Harris, all these other Supreme Court cases tell us that's fine for him to then say, hey, can I talk to you? And that is a voluntary interaction. Takes him by the side of the road because we don't want to have people run over by traffic. That's fine. And in fact, the police aren't even required to tell you you're free to go after they hand you your stop. That is true. All they have to do is hand it back and then ask the question. The traffic stop had ended. He's arguing that there's a second seizure. There's no amendment on Hall factors at all present here. There weren't multiple officers present when he initially asked them to talk to him. No other officers present when he initially got that first permission or consent to search. There was no officer drawing a weapon. There was no raising of voices, no indication of any intimidation whatsoever. A citizen could terminate that at any time. He could have said, you know what, I've really got to get going. I've got a long drive going. I really don't have time to talk. Get in there and take off. How many people do you think realistically would do that? Mr. Rodriguez did in Rodriguez v. United States. How many people do you think would reasonably do that? I think a fair number of people would. And the Supreme Court has told us that that is the case. The Supreme Court says that reasonably innocent people would feel free to go. But when you talk to most people, they tell you that they would not feel free to go. As long as a police officer is standing there holding your papers or asking you questions, you're not going to feel like you're free to go. I would refer... I'm sorry. I'm sorry. Go ahead. Well, anecdotal evidence does not trump Supreme Court precedent. The problem is that, you know, I refer to... I guess it's nothing in the record. You know, there was a lawsuit in southern Illinois about an officer who kept a defendant after he said he didn't want to go or he didn't want to continue talking. There's other cases in which the defendants have said that they don't want to go, and they've stopped. You know, what happened in Rodriguez, if it happened even before Rodriguez in this state, it would have had the same result. We had a case in this court where the police officer told the people that they were free to go, and they started walking down the highway, and they arrested them for walking on the highway. They said, You're free to go. Your car is not. And, you know, we've got all kinds of cases that are showing that they say you're free to go, and you're not. However, there's nothing in this case that indicates that. Case in point. Mr. West here was kindly discussing about how his father, grandfather, or some relative was the last police officer on a horse. A horse out west of someplace, and he was the last one killed in the land of duty on a horse. I don't exactly remember what the full details of the story was, but it's something that's just a conversation. There's nothing intimidation that's going on here at all. There's no indication that Officer Johnson was doing anything other than what the cases have said, You're free to do. So, unless Mr. West had testified, and even then, you look at, again, the reasonable citizen, Supreme Court cases saying that that's, in that situation, it is, a citizen is free to terminate. He could have done so at any time. Even that, as Justice Schmidt pointed out, a second bite at that apple by saying, Now do I still have your consent to search? He could have said no. At that point, if he had said no, and the officer didn't let him go, that would have been a seizure, an illegal seizure under Rodriguez. That's not what happened here. The officers, because at this point, there are now two. Yes, but two is not an intimidating factor, even under Mendenhall. You'd have multiple officers. Mendenhall is subject to open. It's not an exhaustive list. You do it on a totality of the circumstances, on a case-by-case basis, and if we're looking at this case, and I'm looking at it, I'm thinking that this is intimidation. I would respectfully disagree, Your Honor. Okay. I guess since the other issues were not argued, I guess we'll stand on our briefs on those unless you have any other questions. Thank you, Your Honor. Thank you. Mr. Fisher. Thank you, Your Honor. With respect to the second officer, it's interesting because I think things might could be different with two officers right from the start. Here you have one officer from the start. Again, for the first 16 and a half minutes of the encounter, it's Officer Johnson and Mr. West. Then you have the second officer arriving on the scene. Now, again, we know that it's because Officer Johnson, a few minutes in, requested a second officer, actually hoping for a K-9, but settling for just a backup officer. But in terms of the impression on the defendant, objectively speaking, a reasonably innocent individual, it's just a traffic stop that's just him and myself, and all of a sudden Officer No. 2 is here. The fact that he arrives late would be even more intimidating in raising questions in the defendant's mind. If I'm free to leave, the stop's over and done with, there's nothing more to be done here. But now I've got Officer No. 2, and Officer 1 brings me back to Officer 2 and has me explain to Officer 2, once again, my travel plans. I think that's very intimidating. Now, if... But even after, it was after the second officer arrived that the officer once again said, hey, do I still have your consent to serve? True, true. And the reality is, in the real world, that officer's got two options if he's by himself. You know, you're not going to turn your back on somebody that you suspect, and you're searching a car that he suspects loaded with drugs. It's a good way to get yourself killed. Or you handcuff the guy, and you might have to handcuff him, you're going to make him scream seizure on that one, too. So somebody's keeping an eye on this guy while you've got your back to him and you're searching his car. Sure. And that's, you know, the officer's probably thinking all of these things, whether Mr. West is knowledgeable about all these things. And, again, your officer said, your honor said, basically with the purpose at that point as well, you know, he said he's going to search the vehicle and keep him safe. So in the officer's mind, right from the beginning, he wants to search the vehicle. That's his intent right from the get-go. And so that's why Officer No. 2 is coming in. And maybe John West is thinking, oh, maybe Officer 2 is here to search the vehicle, to hold me while Officer 1 searches the vehicle. It's not as if Officer Johnson obtained consent, and then Officer Johnson radioed us for a backup, and within a minute you've got Officer No. 2. That's not how it happens here. And so I think here the late arrival of that second officer, and the defendant having once again to explain himself to Officer No. 2 and again to Officer No. 1, the clear message being sent is, I don't believe you. I'm not done with you. You can't. But legally he didn't have to explain himself to anybody. He said, you know, it's been a nice chat with the officers. He said I'm free to go. He could have insisted on his rights. He could have insisted on his rights. Again, a man with no legal training, I think most individuals. And not necessarily saying that this court should decide the case in such a way that's going to prevent police officers from making stops or searching vehicles. It comes down to the facts of each individual case. Again, it's a case-by-case analysis, totality of circumstances. And so if your honors were to reverse here, that doesn't mean all of a sudden it's going to be, you know, incredibly difficult for police to search out criminals or for state's attorneys to prosecute. Well, I mean, we don't get to make up the laws. We go where the appellate court. We've got to follow Illinois and Fourth Amendment, U.S. Supreme Court. Well, sure, sure, sure. Again, where it's a consent search, it has to be a voluntary consent search. And that's a question based on all of the circumstances here. I think if the officer in the squad car asked him once about his travel plans, maybe even twice, and then if that was the end of the topic, I think it matters on everything that was presented and how everything was presented. It's interesting, counsel talks about the defendant talking about his grandfather and didn't seem to be nervous. In viewing the videotape, I didn't necessarily pick up nervousness, but that's one of the factors the officer cited. And on the tape, you see after the defendant says, yeah, okay, go ahead and search the car, the officer says, why are you so nervous? So obviously the officer is thinking this individual is nervous. And in terms of intimidation, I think there's, I mean, it's part and parcel of being the subject of a traffic stop, but I think it's also part and parcel of all these questions and this clear message being conveyed, you're really not free to leave. You've got to stick around. You've got to let me search the vehicle. Counsel in law states that Officer Johnson said, well, this stop is about the same length as all of the stops. Of course, that can be a little bit self-serving, but the evidence shows this officer is a bit chatty. He's digging for information. Ultimately, he finds drugs. But it's interesting. One of the things the officer testifies to is that some of the questions he asks, and he says he asks these questions at everybody he stops. He says some of the questions are for the purpose of putting the individual at ease and giving that person a good impression of the police. In effect, public relations. Now, maybe from a one-on-one public relations standpoint, maybe that's great, although I'm not aware of any case law saying that those questions can justify prolonging a stop, and the stop could have taken place in a much shorter period of time, given the tasks that he needed to perform arising from the traffic violations. And had it been a shorter stop, I think that might have played into whether the defendant, in fact, takes up the offer to leave or not. But I think clearly here the officer was stalling for the backup officer to arrive, and I think the length of time, again, is a factor to be considered in determining whether the consent was voluntary. The defendant submits that it was not, and that is the reason he respectfully asks this court to reverse the order denying the motion to suppress and to reverse his conviction. Any other questions? Thank you, Your Honors. We thank both of you for your arguments this morning, this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible. The court will now stand in brief recess for a panel change.